**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FREDERICK WADE K. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-343-SLR |
| | ) | |
| DEPARTMENT OF CORRECTION, *et al.*, | ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO DISMISS/SUMMARY JUDGMENT PURSUANT TO RULE 12 (b)(1) and 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

**I.   Introduction**

At their most specific, Plaintiff's allegations in this case appear to involve his claim that Defendant violated the Eighth Amendment by subjecting him to cruel and unusual punishment due to the use of excessive force to control Plaintiff's aggressive behavior.

Defendant refers to matters outside the pleadings; therefore the Court may treat its motion to dismiss as one for summary judgment.  *See* Fed. R. Civ. P. 12(b)(6);  *Camp v. Brennan*, 219 F.3d 279, 280 (3rd. Cir. 2000) (consideration of matters beyond the complaint converts a motion to dismiss into a motion for summary judgment).   Defendant Williams contends that he is entitled to judgment as a matter of law because there are no genuine issues of material fact in dispute.  *See Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'").   Defendant asserts that Plaintiff  has not made, and cannot make a sufficient showing of the essential

elements of his case for which he carries the burden of proof. Therefore, dismissal is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In addition, Defendant states, that unless there is sufficient evidence to enable a jury reasonably to find for the nonmoving party on the factual issue, summary judgment should be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    Statement of Facts

This case has its genesis in the denial of a request for a phone call on a winter Saturday night in 2005. Plaintiff Frederick Brown, an inmate incarcerated at the Delaware Correctional Center ("DCC), demanded that phone call. Plaintiff makes the following claims in his Complaint. On the evening of Saturday, February 26, 2005, Plaintiff alleges he was denied permission to make a phone call. Plaintiff claims that he argued with the officer. Officer Terry heard the exchange and Plaintiff admits that the officer responded by warning Plaintiff to stop. Plaintiff admits that he continued to exchange words with Officer Terry. Plaintiff states in his Complaint that "he egnored [sic] me and I called him a Pussy." (*See* Complaint, Statement of Claim, p. 1). Plaintiff states that after failing to obey orders to be quiet and then engaging in name calling to the officer, Officer Terry had the cell door opened, and handcuffed Plaintiff behind his back after getting out his pepper spray but not using it. Plaintiff claims that Officer Terry threatened him and pulled up on the handcuffs while removing Plaintiff from the tier. Plaintiff alleges that Officer Terry pushed him into a window causing him to injure his mouth on the window frame. Plaintiff also claims that Officer Terry grabbed him by his shirt and scratched him on his neck while placing him in the observation room.

Plaintiff goes on to admit that he stepped through his handcuffs so that they were now in front of him. While doing this he "broke a pice [sic] off 'plastic' chair". (Complaint, Statement

of Claim, p. 3).  Plaintiff claims that Officer Terry came into the room, and that the officer "grabs me by my throught [sic]" and started punching him with his fist.  (Complaint, Statement of Claim, p. 4).  While this was occurring, Plaintiff claims that Sergeant Terhune witnessed Officer Terry hit him, and told Officer Terry to stop.

Plaintiff claims that he told Lieutenants Rispoli and Welcome about the incident, and they had the nurse come and examine his face.  Plaintiff claims that they also took pictures of the blood on the walls, and of his injuries.  After he was examined, Plaintiff states that he was offered the opportunity to take a shower, which he refused.  When told he would be sent to "C" tier Plaintiff threatened to commit suicide.  Plaintiff goes on to state that later that evening he tried to commit suicide.  From the cell on "C" tier Plaintiff was moved to the infirmary.  Plaintiff claims that no one investigated his claims against Officer Terry.  Further it appears that he is alleging that no one resolved his claims to his satisfaction.  (Complaint, Statement of Claim, p. 7-8).

The records made at the time of the incidents, document that an incident occurred, but with detail that Plaintiff leaves out of his recitation of events.  These records , along with the medical records regarding the incident, were made contemporaneously with the events that evening. (*See* Affidavit of Michael Little, attached as Exhibit "A").  In the early evening of February 26, 2005, Plaintiff demanded the opportunity to make a phone call.  Officer Samantha Layton told him that the phones were off for the evening and that no phone calls were allowed. (*See* Incident Report of Samantha Layton, attached as Exhibit "B"). Plaintiff continued to attempting to argue with the officer who told him that she was not going to argue with him further, and was leaving the area.  (Ex. B). Officer Layton then walked away form Plaintiff's cell, accompanied by Officer Terry.  Plaintiff continued to yell at Officer Layton, cursing and

using foul language. (Ex. B). Officer Terry went back to Plaintiff's cell and spoke to him through the door flap. Officer Terry was heard telling Plaintiff that he was not to be disrespectful to staff. (Ex. B). After Officer Terry closed the door flap, Plaintiff continued yelling and cursing. Apparently the yelling and cursing were so loud that other inmates on the tier were heard yelling at Plaintiff to be quiet. (Ex. B). Officer Terry also heard Plaintiff kicking at his cell door. (*See* Incident Report of William Terry, attached as Exhibit "C"). Due to the commotion Plaintiff was making, and the fact that he failed to stop when ordered, Officer Layton call for other correction officers to respond to the tier. Those officers were Victor Gonzalez and Sergeant Harold Terhune. (Ex. B).

When the other officers arrived, Plaintiff's cell was opened and Plaintiff was ordered to position himself so that he could be handcuffed. (Ex. B). Plaintiff continued to yell and curse at Officer Terry and the others. (*See* Incident Report of Harold Terhune, attached as Exhibit "D"). Plaintiff was handcuffed behind his back and escorted from the tier to the observation room by officers Terry, Layton, Gonzalez, and Sergeant Terhune. (Ex. B, C, D).

While in the observation room, also known as the barber room, Plaintiff's hostile behavior became increasingly aggressive. Officer Michelle Phillips, who was assigned to the control room was able to observe Plaintiff while he was in the observation room. (*See* Incident Report of Michelle Phillips, attached Exhibit "E"). Officer Phillips watched as Plaintiff stepped over his handcuffs, so that his hands were now in front of him. (Ex. E). While executing this maneuver, Plaintiff knocked over a chair. (Ex. E). At about the same time, Officers Terry, Gonzalez, Layton, and Sergeant Terhune heard loud crashing and banging noises from the observation room. (Ex. B, C, D, and Incident Report of Victor Gonzalez, attached as Exhibit "F").

The officers returned to the observation room and observed Plaintiff kicking and throwing the chair around the room. (Ex. B, C, D, F). The barber chair was broken in several places. (Ex., B, C, D, F). Sergeant Terhune and Officer Terry opened the door and Sergeant Terhune ordered Plaintiff to move to the back of the room. (Ex. B, C, D). Before they entered the room, and while they were in there, Plaintiff was observed spitting blood at the walls and windows. (Ex. B, C, D). The officers noticed that Plaintiff had some blood on his lip. (Ex. B, C, D). The officers started to remove the chair and leave the room. (Ex. B, C, D, F). Plaintiff, however, was not finished with the officers. As Sergeant Terhune and Officer Terry were leaving the room, Plaintiff, yelling and cursing, rushed up to Officer Terry and pushed him from behind. (Ex. B, C, D, F). When Officer Terry turned around, Plaintiff pushed him in the chest, hard enough to push him out the door. (Ex. B, C). Sergeant Terhune locked the door, leaving Plaintiff in the observation room.

While these events were occurring, Lieutenant Welcome was notified. (Ex. D, E). After the chair was removed, the lieutenant, accompanied by Lieutenant Rispoli, arrived. Lieutenant Welcome was able to approach Plaintiff and examine his lip. (*See* Incident Report of Lieutenant Welcome, attached as Exhibit "G"). Lieutenant Welcome was able to see what appeared to be a small cut on the inside of Plaintiff's lip on the right side. (Ex. G). Lieutenant Welcome notified the nurse, who came and examined Plaintiff. The nurse reported to Lieutenant Welcome that it appeared that Plaintiff bit his lip. (Ex. G). The nurse also observed that Plaintiff had a few scratches on his neck and a ragged fingernail with blood on it on his right hand. (*See* nursing notes dated 2/26/05, 1950, attached as Exhibit "H"). Lieutenant Rispoli, who also came into the cell with the nurse, observed blood under Plaintiff's fingernails. When asked, Plaintiff stated that he did not know how he got scratched on his back. (*See* Incident Report of Lieutenant

Rispoli, attached as Exhibit "I"). Plaintiff was transferred to "C" tier, where later that same evening he was found by Sergeant Terhune, standing on his toilet with a sheet around his neck. (*See* Incident Report of Harold Terhune, attached as Exhibit "J"). Lieutenant Welcome also observed Plaintiff tying a sheet to the vent above his toilet. (*See* Incident Report of Michael Welcome, attached as Exhibit "K"). The cell door was opened immediately, and without arguing, Plaintiff responded to the officers' orders to get down from the toilet. (Ex. J, K). The medical department was notified, and Plaintiff was subsequently transferred to the infirmary for suicide watch. (*See* nurses notes, dated 2/26/05, 2310, attached as Exhibit "L"). On March 9, 2005, Plaintiff attended a disciplinary hearing regarding the events of February 26th. In the disciplinary hearing Plaintiff did admit that he threw the chair. (*See* disciplinary hearing decision, attached as Exhibit "M").

## **ARGUMENT**

**I.    DEFENDANT DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDEMENT RIGHTS.**

It appears that Plaintiff is attempting to state a claim for excessive force under the Eighth Amendment. However, Plaintiff's allegations do not state a claim for an Eighth Amendment violation.

There are two seminal United States Supreme Court decisions addressing the use of force in prisons: *Hudson v. McMillian*, 503 U.S. 1 (1992); and *Whitley v. Albers*, 475 U.S. 312 (1986). Where prison officials use force to address a prison disturbance, the question of whether the force used inflicted unnecessary and wanton infliction of pain turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-321. Not every "malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. The Eighth

Amendment's prohibition against cruel and unusual punishment excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." *Whitley*, 475 U.S. at 327.

The Supreme Court has instructed that prison officials facing decisions regarding the use of force often must make decisions quickly and their judgment should be given deference in these situations. "[O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S at 6. While weighing these competing concerns, officials must make decisions as to the use of force "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. at 320. Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

    **A.**    **Defendants did not use excessive force against Plaintiff.**

In an excessive force case, as part of the inquiry into "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" the Court must consider: 1) the need for the application of force; 2) the relationship between the need and the amount of force that was used; 3) the extent of the injury inflicted; 4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and 5) any efforts made to temper the severity of the forceful response. *Whitley*, 475 U.S. at 321. The extent of the threat to the safety of the staff and inmates, as perceived by reasonable officials on the basis of facts known to them, must be considered in assessing the use of force. *Hudson*, 503 U.S. at 7.

The use of *de minimis* force does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Whitley*, 475 U.S. at 327. "There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." *Reyes v. Chinnici*, 54 Fed. Appx. 44, 48 (3d Cir. 2002).

When evaluated using the factors enumerated in *Whitley*, Plaintiff's allegations do not state a claim for excessive force. Plaintiff admits in his Complaint that he continued to argue with the correction officer, thus creating the need to restore order. Officers decided force was required to maintain order when Plaintiff's aggressive and disruptive behavior continued to escalate even after he was warned twice to stop. Both Officer Terry and Officer Layton heard Plaintiff yelling and cursing, and Officer Terry noted that Plaintiff was kicking his cell door. Officer Layton even noted that the commotion caused by Plaintiff was so loud that other inmates were heard yelling at Plaintiff to be quiet. (Ex. B). Faced with Plaintiff's increasingly volatile behavior, officers made the decision to remove him from the tier.

The force used to remove Plaintiff from the tier was in proportion to Plaintiff's behavior at that point. Although he continued to yell and curse at the officers, Plaintiff admits that he was handcuffed behind his back without incident. While uncomfortable, this is not a constitutional violation. Plaintiff was walked to the observation room and left in the room alone. The amount of restraint used was relative to the Plaintiff's behavior at that time.

Turning to the third factor listed in *Whitley*, There is no evidence that Plaintiff's minor injuries were inflicted by the correction officers. *Whitley*, 475 U.S. at 321. Plaintiff first alleges that Officer Terry pulled up on the cuffs, hurting his wrists and arms. However, the nurses note that describes Plaintiff's appearance when in the observation room, makes no mention of any

scrapes, bruising or any complaint by Plaintiff regarding his wrists or arms. Nor does Plaintiff mention that he told the nurse that his wrists and arms hurt. This is the same nursing note that provides a detailed description of the inside of Plaintiff's lip, and the blood under his fingernails. (Ex. H). It is reasonable to conclude that any alleged pain Plaintiff experienced in his wrists and arms may have been due to his admittedly defiant behavior of maneuvering the handcuffs from his back to the front of his body.

      Plaintiff's second alleged injury was suffered when he claims that Officer Terry "slams me up in to the windows and my face hits the fraime [sic]…." (Complaint, Statement of Claim, p. 3). The evidence shows that the injuries noted by the nurse are not consistent with the description given by Plaintiff. If force was used as Plaintiff describes, it is reasonable to infer that injury to his face and outside of his lip and outside of the lip would be evident on examination by the nurse. However, the detailed nursing note documented a scrape on the inside of one side of Plaintiff's lip, with three indentations, consistent with biting the lip. (Ex. H). No scrapes, cuts or bruises to the face or outside of the lip were described by the nurse. In addition, later that evening, when Plaintiff was taken to the infirmary after his suicide attempt, the nursing note at 2310 does not indicate the presence of any bruising on Plaintiff's face, lip or wrists. (Ex. L). Although each of the incident reports written by the officers who were present vary slightly, most mention blood on Plaintiff's lip *after* he was in the observation room where he not only maneuvered his handcuffs from the front to the back, but also broke a chair. (Ex. B, C, D, G, I). None of the incident reports note any blood on Plaintiff's lip or shirt *before* he was placed in the observation room. (Ex. B, C, D). The documentation, completed by a variety of people at the time of the incident provides evidence that the scrape to the inside of Plaintiff's lip occurred after he was placed in the observation room, and the indentations in the area of the scrape indicated to

the nurse that he bit his lip, causing a self inflicted injury.

Plaintiff also alleges that he received scratches on his neck when Officer Terry "grabs my shirt by the neck…" (Complaint, Statement of Claim, p. 3).  Although Plaintiff alleges that he received scratches on his neck from Officer Terry, the nurse noted blood under his fingernails and a "jagged nail with blood on the nail." (Ex. H).  If, assuming *arguendo*, that Officer Terry did grab Plaintiff by the shirt and scratch his neck as Plaintiff claims, the *de minimis* nature of the injury is indicative of *de minimis* force.  This is the type of injury that fits within the Supreme Court's holding in *Hudson*, that not every "malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson*, 503 U.S. at 9.

Finally, Plaintiff claims that when Officers Terhune and Terry opened the observation room door, Officer Terry came in and started punching Plaintiff in the face.  If the officer was punching Plaintiff in the face as he claims in his Complaint, it is reasonable to infer that Plaintiff would have some marks on his face to indicate he was hit in the face.  However, as stated above, in her note where she provides a detailed description of the injury to Plaintiff's lip, there is no documentation by the nurse of any injuries to Plaintiff's face at the time of the incident or later in the evening when Plaintiff went to the infirmary after his suicide attempt.  Plaintiff claims that Officer Terhune told Officer Terry to stop.  A review of Officer Triune's report indicates that Plaintiff actually pushed Office Terry as he was leaving the observation room while yelling and cursing at the officer.  (Ex. D).  The evidence demonstrates that not only is there no indication that Plaintiff was punched repeatedly in the face as he claims, but that Plaintiff was actually the aggressor when he pushed Officer Terry,

The correction offices acted responsibly when they removed Plaintiff from his cell and placed him in the observation room.  Plaintiff's escalating verbal and physically aggressive

behavior while in his cell was disturbing to the other inmates on the tier, and created a hazard to Plaintiff's safety. Officers moved him from the tier to an area where he could be watched, and where there where fewer physical hazards. Placing Plaintiff in a room with minimal furniture, where he could easily be observed, and would be less likely to injure himself, tempered the severity of the response to his aggressive behavior.

The correction officers acted appropriately in response to Plaintiff's uncontrolled, increasingly hostile behavior. The evidence shows that Plaintiff did not suffer the injuries he alleges at the hands of Officer Terry, and the evidence indicates that Plaintiff's minor injuries may be self inflicted. Therefore, Plaintiff's Complaint does not state a claim for violation of the Eighth Amendment, and his claim must fail.

## II.    PLAINTIFF DOES NOT MEET THE CRITERIA TO HAVE COUNSEL APPOINTED.

In his Complaint Plaintiff requests appointment of an attorney to represent him, without providing any rationale for his request. In a letter to the Court dated February 22, 2006, Plaintiff asks for counsel again, stating that he lacks legal training, and that he takes medication. (D.I. 39). *Pro se* litigants proceeding *in forma pauperis* have no constitutional or statutory right to appointed counsel. (See, *Smith Bey v. Petsock*, 741 F. 2d 22, 25 (3d Cir. 1984)). It is solely within the Court's discretion to appoint counsel for the plaintiff; however, such an appointment is "usually only granted upon a showing of special circumstances indicating a likelihood of substantial prejudice to him resulting... from his probable inability without such assistance to present the facts and legal issues to the court in a complex, arguably meritorious case." Id at 26, *accord, Pierce v. Vaughn*, 1992 WL 210122 (E.D.Pa.); *Robinson v. Barone*, 1992 WL 236869 (E.D. Pa.). The factors appropriately considered in deciding whether an appointment of counsel is warranted include the arguable merit of the plaintiff's claim, the plaintiff's ability to present

his case, the difficulty of the particular issues, the degree to which factual investigation will be required and the plaintiff's ability to pursue such investigation, the likelihood that witnesses' credibility will be key issue, and the need for expert testimony.  *Tabron v. Grace*, 6 F.3d 147, 155-56 (3d Cir. 1993), *cert. denied*, 114 S. Ct. 1306 (1994). In addition, the Court must determine if the resources, in the form of manpower and funds, are available to provide counsel in the face of the increasing number of prisoner civil rights suits filed.  *Id.* at 157.

In Plaintiff's case, he has been able to present his case in the form of the Complaint and Amended Complaint (D.I. 19), and motions.  The issues in this case are straightforward.  Plaintiff has shown that he is able to present his case.  There is no evidence that Plaintiff has been or will be substantially prejudiced in presenting his case.  In addition, lack of training in the law does not mandate the appointment of counsel.  Finally, a case such as this, which does not present complex facts or legal issues, does not merit the expenditure of resources for counsel.  Further, Plaintiff fails to establish that without the appointment of counsel that he demonstrates any other "special circumstances indicating the likelihood of substantial prejudice" cited by the Court in *Smith-Bey*.  *Smith-Bey* at 26.  The State contends that Plaintiff has demonstrated that he is fully capable of litigating this lawsuit, making appointment of counsel unnecessary.  This case is neither factually or legally complex, and therefore, court appointed counsel is not warranted.

**III.   THE ELEVENTH AMENDMENT IMMUNIZES DEFENDANT FROM SUIT IN HIS OFFICIAL CAPACITY.**

The Plaintiff's complaint arguably names the Defendant in his official capacities.  The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State."  While the Amendment does not facially bar suits against the State by its citizens, the United

States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). "The Eleventh Amendment limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed." *Neeley v. Samis*, 183 F. Supp. 2d 672, 678 (D. Del. 2002) (*quoting Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98-100 (1984)). The United States Congress can abrogate a state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive the states' immunity will produce this result. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). No such clear intent can be seen in 42 *U.S.C.* §1983. In fact, a review of the statute demonstrates that Congress did not intend to waive the states' immunity. The statute facially allows suits only to be brought against "persons." 42 *U.S.C.* §1983. Neither the State of Delaware, nor agencies or officials of the State of Delaware are "persons" as contemplated by 42 *U.S.C.* § 1983.

A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the Defendant in his official capacity is not a "person" for the purposes of 42 *U.S.C.* § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989). Consequently, given this categorization, this Court lacks jurisdiction over Defendant in his official capacity, and Defendant is outside the class of persons subject to liability under 42 *U.S.C.* § 1983. Accordingly, any "official capacity" claims against Defendant

should be dismissed based on the Eleventh Amendment to the United States Constitution.

**IV.    DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY.**

The doctrine of qualified immunity protects government officials from civil liability insofar as their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects officials from the personal cost of litigation and the attendant inhibiting effect litigation has on the proper discharge of their official responsibilities. *Lee v. Mihalich*, 847 F.2d 66, 69 (3d Cir. 1988).

The Supreme Court has announced unequivocally that the District Court, at the earliest possible stage of litigation, must consider the defense of qualified immunity under a legal standard separate and apart from its analysis of the underlying claim itself.  These two analyses are not susceptible to fusion, and cannot be left for factual resolution by the trier of fact. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The first question before the Court in a qualified immunity analysis is whether, taken in the light most favorable to the party asserting injury, the facts show that the prison officials' conduct violated a constitutional right. *Brosseau v. Haugen, 125 S.Ct. 596, 598 (2004)(citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  For the reasons set forth above, Plaintiff has failed to provide any evidentiary support to any of his alleged constitutional violations.  In addition, Plaintiff's claims also suffer from several legal defects as set forth above.  Plaintiff fails to make out a constitutional violation.

The next stage of the qualified immunity analysis requires the Court to ask whether the constitutional right allegedly violated was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it

would be clear to a reasonable prison official that his conduct was unlawful in the situation he confronted." *Id* at 202. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court must ask whether a reasonable public official would know his or her *specific conduct* violated clearly established rights. *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996). "The 'salient question' is whether the state of the law at the time of the challenged conduct gave defendants 'fair warning' that their action was unconstitutional. *Black Hawk v. Pennsylvania*, 225 F.Supp.2d 465, 480 (M.D. Pa. 2002)(*quoting Hope v. Pelzer*, 536 U.S. 730,741 (2002)(articulating the "clearly established" inquiry to require that an official have 'fair warning' that the alleged activity engaged in was unconstitutional)).

Plaintiff's claims are based on heretofore unrecognized legal rights based on chimerical guarantee of protection. Nothing in his Complaint or records supports a finding that Defendant ever engaged in any conduct which violated Plaintiff's rights. Assuming *arguendo* Plaintiff's ability to support any violation of any constitutional right, there is no legal authority which would provide Defendant with "fair warning" that his alleged activities were unconstitutional. Accordingly, Defendant is entitled to the defense of qualified immunity and summary judgment in his favor.

**V.    DEFENDANTS ARE ENTITLED TO DISMISSAL BECAUSE THE PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Though *pro se* pleadings are entitled to leniency, such pleadings must still place a defendant on notice as to what wrong he has supposedly committed. *Riley v. Jeffes*, 777 F.2d 143, 148 (3d Cir. 1985) ("[I]f a plaintiff presents only vague and conclusory allegations, the complaint should be dismissed."). *See also Solis v. Breslin*, 107 Fed.Appx. 262, 264 (2d Cir.

2004)(quoting *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514 (2002)(affirming the District Court's dismissal of a *pro se* inmate's complaint because he had "not alleged the occurrence of any specific acts" which gave the defendants "fair notice" of what his claim was and "the grounds upon which they rest."). "Plaintiffs suing governmental officials in their individual capacities, . . . must allege specific conduct giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). "This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to a constitutional violation." *Id.* Although facts must be read in a light favorable to the non-moving party when considering a motion to dismiss or for summary judgment, there is no requirement to accept as true factual allegations that are vague and amorphous and thus cannot be proved.

     A review of Plaintiff's Complaint and other pleadings provides no evidence of the alleged assault he claims occurred. Plaintiff provides only bald allegations that are refuted by the evidence presented by Defendants. In his recitation of events, Plaintiff leaves out any indication of his increasingly aggressive behavior, which culminated in pushing Officer Terry from behind, as the officer was leaving the room. However, Plaintiff's Complaint does reveal that he did not obey orders to be quiet and lay down, but continued to argue with the correction officer, thus creating the need to restore order on the tier. The incident reports and nurses notes were completed at the time of the event, describe each officer's unique observation of the incident, along with the nurse's detailed description of Plaintiff's injury. Although each document varies slightly, all report on aspects of Plaintiff's hostile, aggressive and violent behavior. Therefore, Defendants are entitled to summary judgment.

## CONCLUSION

     For the foregoing reasons, Defendant Williams respectfully requests that this Honorable

Court enter an order dismissing Plaintiff's claims against him with prejudice.

                                                          **STATE OF DELAWARE**
                                                          **DEPARTMENT OF JUSTICE**

                                                          /s/ Lisa Barchi
                                                          Deputy Attorney General
                                                          820 N. French Street, 6th floor
                                                          Wilmington, DE 19801
                                                          (302) 577-8400
                                                          lisa.barchi@state.de.us

Date:  March 27, 2006                                       Attorney for Defendant

## *CERTIFICATE OF MAILING AND/OR DELIVERY*

I hereby certify that on March 27, 2006, I electronically filed *Defendant's Memorandum of Point and Authorities in Support of His Motion to Dismiss/Summary Judgment* with the Clerk of Court using CM/ECF. On March 27, 2006, I mailed by United States Postal Service, the document to the following non-registered participant:

Frederick Wade Brown
SBI # 305890
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**

/s/ Lisa Barchi
Deputy Attorney General
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
lisa.barchi@state.de.us

Attorney for Defendant